IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANDREA DALAKER,<br><br>    *Plaintiff,*<br> v.<br><br>FLYWHEEL DIGITAL LLC,<br><br>    *Defendant.* | Civil Action No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Andrea Dalaker, by and through counsel, files this Complaint against her former employer, Defendant Flywheel Digital LLC, and states claims for race (Asian), national origin (Filipino), and sex (female) discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*., and the Maryland Fair Employment Practices Act ("FEPA"), Md. State Gov't Code §§ 20-601 *et seq*., as well as claims for violation of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), for Defendant's unlawful compensation practices on the basis of gender, and the Maryland Equal Pay for Equal Work Act ("MEPEWA"), Md. Labor & Employment Code §§ 3-301 *et seq.,* for Defendant's unlawful compensation practices on the basis of race and gender.

### INTRODUCTION AND NATURE OF THE ACTION

1. First, Plaintiff suffered a significant pay disparity in comparison with her white and male comparators, principally Senior Director Rob Kearns, who earned over $60,000 more than Plaintiff did in annual salary for performing comparable or equal work requiring equal skill, effort, and responsibility as Plaintiff's work, and which was performed under similar working conditions. Kearns was also bonus-eligible, and Plaintiff was not. The unexcused pay disparity and unequal pay treatment subject Flywheel to liability for race, national origin, and sex discrimination under

1

Title VII of the Civil Rights Act of 1964 and the Maryland Fair Employment Practices Act, and subject Flywheel to liability as well under the Equal Pay Act and the Maryland Equal Pay for Equal Work Act.

2.      Second, starting with the time Plaintiff was promoted to Director in 2022, and to Senior Director in April 2023, and continuing with the formal request Plaintiff made in March 2024, Plaintiff anticipated being eligible for a bonus, based on her conversations with management and her cumulative accomplishments on the job. In April 2024, her request for bonus eligibility was denied, despite the fact that white employees of equal or lesser responsibility became bonus eligible, *e.g.*, Kearns and Morgan Scott, a white female in the same role on the same team as Plaintiff was, and who was offered bonus eligibility at the time she was promoted to Director. Flywheel's actions in denying Plaintiff the opportunity to earn and be paid a bonus subject the company to liability under federal and state employment law referred to above.

3.      Third, starting in early 2023, Plaintiff sought a salary adjustment in line with her work experience, job responsibilities, and accomplishments, but her salary was not adjusted commensurately, as the company denied her request. Later, in the March-April 2024 timeframe, Plaintiff had a further discussion with Human Resources about a salary adjustment, but that was unsuccessful as well. Yet in that same timeframe, Austin Seibert, a white male business manager two levels below Plaintiff, received a $50,000 salary increase in a single day. Flywheel's adverse disparate treatment of Plaintiff under these facts subjects the company to liability under federal and state employment law referred to above.

4.      Fourth, in July 2024, Plaintiff applied for the position of Vice President of Commerce Operations, a position for which Plaintiff was especially well-suited based on her experience and expertise. The company selected a less-qualified white male, Meir Areman, for the position. Plaintiff's non-selection for the Vice President job, based on all the circumstances, is a

result of race and sex discrimination, and subjects Flywheel to liability under federal and state employment law referred to above.

5.      Fifth, the discrimination on the basis of race, sex, national origin, and retaliation was exacerbated when the company froze Plaintiff out of employment opportunities, offering purely pretextual excuses for doing so. Plaintiff brought many business development ideas to leadership. Plaintiff pitched projects and even wrote a job description for a centralized operations director. In response, Plaintiff received contrived messages about why Flywheel couldn't move forward with it, including "give us more time," "ok we'll let you know," "the team isn't ready for it yet," or "Let's start with this first." Then it would later get cancelled or deferred. Additionally, when her manager was on maternity leave, Plaintiff asked for better visibility for projects and meetings since she was normally the proxy to this information, but those requests were denied. Upon the announcement of Flywheel integrating with Omnicom, Plaintiff offered to help on those workstreams but was rejected. Due to unlawful discrimination, Flywheel intentionally kept those opportunities from Plaintiff to hinder her career progression and devalue her role before ultimately terminating Plaintiff's employment.

6.      Sixth, when Plaintiff complained of the actions against her and the loss of opportunities, Flywheel retaliated by continuing to take adverse actions against her, resulting in the termination of her employment. After following up with management regarding the failure to pay Plaintiff a bonus, after phone conversations with Human Resources on the subject, and after written follow-up of key points about inequitable pay and bonus eligibility, Plaintiff was transferred to a newly formed team without her knowledge and then terminated from her employment on the same day. This was one week after Plaintiff received a positive mid-year review from her direct manager, Hannah Donoghue. The timing and the manner in which Plaintiff's employment was terminated was calculated, and in retaliation for her having

complained about pay inequity and discrimination.

## PARTIES

7.      Plaintiff, an Asian woman of Filipino origin, has over 14 years of experience in digital commerce, advertising, and operations, nearly half of that time with Flywheel. In her position as Senior Director of Client and Consulting Operations at Flywheel, she employed an array of technical skills, leadership, and team management capabilities. She developed several of Flywheel's Standard Operating Procedures, developed project management systems, and managed and led top performers on the Client Services and Client Education team. She consistently received favorable performance evaluations, including "exceptionally well" in 2023.

8.      Defendant Flywheel is a Maryland limited liability company that offers advertising, media, marketing, data analytics and other digital commerce services to businesses, employing generative and agentic AI. Flywheel provides services in retail commerce operations, media execution, and market intelligence. Flywheel has over 1,000 employees. Flywheel has a principal office in Maryland at 1801 Porter Street, Baltimore, Maryland 21230. Its registered agent is CSC-Lawyers Incorporating Service Company, 7 Paul Street, Suite 820, Baltimore, Maryland 21202. At all times relevant to this action, Defendant was and is an "employer" within the meaning of 29 U.S.C. § 203(d), 42 U.S.C. § 2000e(b), Md. State Gov't Code § 20-601(d), and Md. Lab & Empl Code § 3-301(b).

## JURISDICTION, VENUE

9.      The unlawful employment practices alleged in this complaint occurred in the State of Maryland.

10.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 216(b), 42 U.S.C. § 2000e-5(f), Md. State Gov't Code§ 20-1013, and Md. Lab

& Empl Code § 3-307. The Court has personal jurisdiction over the Defendant and venue is proper in Maryland pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because the Defendant resides in Maryland and the events or omissions giving rise to Plaintiff's claims occurred in Maryland. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## ADDITIONAL FACTUAL ALLEGATIONS

### A. Plaintiff's Job Performance

11.     At all times during her employment at Flywheel, including but not limited to her service as Senior Director of Client and Consulting Operations, Plaintiff performed her job duties satisfactorily and in an exemplary manner. Her promotion to Senior Director, following service as a Director for one year, was posted on a company-wide town hall announcement, in which her manager at the time, Megan Lippert, noted Plaintiff's merit-based accomplishments that made her deserving of the promotion. During her 7-year tenure at Flywheel, Plaintiff did not receive a single poor performance review, and continually outperformed her peers. Plaintiff ranked either "performing well" or "performing exceptionally" on all performance reviews, which were the two highest rankings at Flywheel.

12.     Plaintiff's last performance review prior to separation, a midyear review performed only a couple of weeks before her employment was involuntarily terminated, indicated that she was performing well and on "the cusp" of working exceptionally in her role as Senior Director. Her manager, Hannah Donoghue, commented that she was impressed with Plaintiff's work, learning processes from the ground up, deconstructing them, and improving them to solve pain points that had existed on the consulting team for over 10 years. These projects were completed independently, as Plaintiff was not provided a team to support Consulting Operations projects assigned to her, including during the three months that her manager was on maternity leave. Moreover, the transactional project Plaintiff had completed just a month before termination

received accolades from users regarding the positive impact of her work.

**B. Plaintiff's Discriminatory Pay Disparity in Comparison With Non-Asian and Male Employees Doing the Same or Substantially Similar Work**

13.     In comparison with her male and non-Asian counterparts at Flywheel, Plaintiff suffered discriminatory pay disparity for performing comparable and equal work requiring equal skill, effort, and responsibility as her work, and which was performed under the same or similar working conditions.

14.     The comparators for Plaintiff's equal pay and pay discrimination claims are the small group of Senior Directors companywide at Flywheel. The dynamics, lack of structured frameworks, frequent organizational changes at Flywheel, and role classification among the band of Senior Directors demonstrate their cohesiveness for pay comparisons, regardless of their business unit or the identity of their direct managers.

15.     In 2024, there were only around 10 senior directors in a company of more than 1,000 employees. It was not unusual for there to only be one Senior Director in a business unit except for the larger units (such as Client Services, Media or Client Services, Retail).

16.     Flywheel changed business unit and role names frequently, without affecting the cohesiveness of the Senior Director group for pay comparison purposes. Between March 2022 and August 2024 Plaintiff held numerous job titles including: Head of Capabilities Acceleration, Associate Director of Integration (changed to Director), Associate Director of Client Operations (which was changed to Director of Client Operations), and Senior Director, Client Operations (which for the latter half of her time in this role was synonymous with Senior Director, Consulting Operations.) Throughout these title transitions, the essence of Plaintiff's role did not change – to add operational efficiencies and synergies that promote tailwinds for the Client Service organization and company at large.

17.    Similarly, Rob Kearn's role had changed from eCommerce Growth to Programmatic Strategy, but he maintained similar responsibilities for growing the display media business, a tailwind to the Client Service organization. Moreover, despite holding the same title of Senior Director, Client Operations, for one and a half years, Plaintiff had moved business units from Client Services to Consulting and back to Client Services during this time. This illustrates the fluidity of Flywheel's organizational structure, without changes in essential role frameworks. Plaintiff ultimately was placed in the Enterprise division of Flywheel under Alex McCord, but her overall roles and responsibilities did not change appreciably and the expectations of her in this role did not change at all. She was still responsible for driving priorities directly contributing to the company's objectives and key results (OKRs), which was the expectation common to all senior directors.

18.    Despite a lack of formal job descriptions, Senior Directors shared the same job expectations within their teams, and they held similar power within the chain of command. For example, all Directors and Senior Directors were responsible for leading or contributing to OKRs at the company and business unit (BU) levels. Typically, a BU OKR rolled into an overarching Company OKR to cascade accountability downward while swimming toward the same overall goal. Plaintiff, like most of the other Senior Directors, owned 1-3 OKRs, which entailed not only responsibility and accountability for projects related to them, but also reporting responsibility on the status and progress of these projects and the overall OKR. At the time of her separation. Plaintiff's OKRs were green, demonstrating not only that she performed the work at the Senior Director level, but also that she contributed to the overall success of the company and its highest priorities.

19.    At Flywheel, it was not unusual to have Senior Directors leading different projects and performing different tasks, but the expectations, level of responsibility, and delegation of

authority (DOA) for the roles were the same. The following are illustrative of the ways Flywheel Senior Directors perform the same or substantially similar work for equal pay comparison purposes:

a. Lead company OKRs or business unit specific OKRs that cascaded from Flywheel's company OKRs

b. Responsibility for providing monthly and quarterly updates on the progress towards OKRs and escalating any barrier or delays

c. Accountability for creating and leading workstreams and related projects to facilitate progress towards overarching OKRs or other business objectives

d. Lead projects and other key initiatives related to company or business OKRs and priorities

e. Collaborate with other teams and leaders to support cross-functional projects and workstreams

f. Oversee external partner relationships (*e.g.,* client, vendor, or retailer)

g. Occasionally present on Town Halls or lead company-wide meetings or trainings

h. Accountability for resolving escalations at the business unit or team level.

**C. Pay Comparison With Rob Kearns**

20.    Rob Kearns was hired as the Director of eCommerce Growth in June 2022 and paid approximately $70,000 in annual salary more than Plaintiff around the same time that she was Director of Client Operations. Kearns' more recent role of Senior Director, Channel & Enterprise Solutions was not his role until that team was newly formed in December 2023.

21.    As a Director, Plaintiff was paid $160,000 per year compared to Kearns' $230,000 annual salary – an approximate 44% pay variance. When Plaintiff was promoted to Senior Director in the Spring of 2023, her annual salary increased from $160,000 to $168,000 – still a $62,000 pay disparity, and only a 5% increase which is below-standard and disproportionately low in

comparison with salary increases received by white males.

22.    Kearns did not possess skills, experience, or qualifications superior to Plaintiff's that would justify the enormous salary gap between them. Kearns did not bring to the Senior Director position more relevant experience, unique skills, or more tenure, than Plaintiff did. Plaintiff possessed the same or more skill, effort, and responsibility, as well as the same or similar working conditions as Kearns – both worked from home at the time, and both their teams were assigned to the Baltimore office. Despite his ambiguous title of eCommerce Growth, Kearns was responsible for growing Flywheel's display business. During her tenure on the media team, Plaintiff helped pioneer the display media business at Flywheel and had joined Flywheel with four years' prior experience in display advertising.

23.    With her experience, Plaintiff was more qualified to fill the role that Kearns was hired for and had a recent proven track record of growing business commercially. Given that Kearns worked from home in Florida, the salary disparity cannot be explained by regional cost-of-living differences. Moreover, Kearns stepped into a new role that hadn't yet shown profitability, so there was no clear basis for the inflated salary. Kearns was provided the inflated salary because he is a white male and a friend of Flywheel CEO Alex McCord, and not because of merit, skill, experience or other nondiscriminatory reasons.

**D.  Plaintiff's Non-Selection for Vice President of Commerce Operations**

24.    Flywheel's selection of Meir Areman, a white male, for the position of Vice President of Commerce Operations in 2024, and the rejection of Plaintiff's application for that job, was due to race and sex discrimination and retaliation against Plaintiff. The position of Vice President of Commerce Operations is one for which Plaintiff was especially well-suited based on her experience and expertise. Areman, by objective measures, was less qualified for the job than Plaintiff was.

25.     Indicative of the discriminatory and pretextual features of the Areman selection was Flywheel's failure to follow a fair and equitable interview process. Flywheel offered inconsistent feedback regarding the ranking of candidates in the selection process, and failed to provide written feedback concerning key portions of the interviews. For example, Flywheel orally provided Plaintiff supposedly unfavorable feedback regarding Plaintiff's responses in the interviews regarding certain aspects of job performance, when in fact those aspects of job performance were not discussed in the interviews. The interviews concealed candidate preselection and portrayed a false sense of fairness, with CEO McCord manipulating the interview outcome to favor the candidate he intended to appoint.

26.     Flywheel's claim that Areman was more qualified than Plaintiff, with more applicable skills and experience, is pretextual. By objective measures, Plaintiff was more qualified for the position. Flywheel acknowledged that Plaintiff was responsible for building processes and improving efficiency. Her final project, completed right before separation, created a complex transactional process to track and measure Consulting projects for clients. Also, the Commerce Operations Vice President job was to oversee the Client Service team with a heavy focus on media, an area led by Plaintiff during most of her tenure at Flywheel.

27.     Plaintiff was a top performer on the Client Service Media team not only for growing commercial accounts, but also for building new processes and playbooks that Flywheel uses as Standard Operating Procedures. Her accomplishments were recognized with the Media Award in 2021. She also led and implemented process improvements within the Financial Operations organization, helping to reconcile and collect millions of dollars of outstanding client revenue. The conclusion that Areman's selection was rooted in discriminatory preference and not on merit in comparison with Plaintiff's skills and experience is borne out by Areman's short tenure in the position and Commerce Operations' failure to meet its performance goals under Areman.

10

**E.  Pay Comparison with Austin Seibert**

28.    Starting in early 2023, Plaintiff sought a salary adjustment in line with her work experience, job responsibilities, and accomplishments. Flywheel denied her request. Later, in the March-April 2024 timeframe, Plaintiff had a further discussion with Human Resources about a salary adjustment, but that was unsuccessful as well.

29.    By contrast, another example of Flywheel's discriminatory pay practices is the pay increase given to Austin Seibert, a white male, in 2024. Flywheel's claim that Seibert received a salary increase of $50,000 as part of his promotion to Senior Manager, Commerce Operations is false. Seibert did not hold the position of Senior Manager, Commerce Operations until the Commerce Operations team was formed, in or around September 2024. Seibert received the $50,000 salary increase in or around March or April of 2024, predating the formation of the team by months. Seibert's extraordinary pay increase in a single day was not based on merit, but rather is further evidence of Flywheel's pattern of bias and inequitable pay and promotion practices in favor of white employees, particularly white males.

**F.  Pay Comparison With Morgan Scott and Other Bonus Eligible Employees**

30.    Over the course of two years, Plaintiff was denied bonus eligibility, while less-deserving white employees of equal or lesser responsibility became bonus-eligible. These included Rob Kearns and Morgan Scott, a white female in the same role on the same team as Plaintiff was, and who was offered bonus eligibility at the time she was promoted to Director.

31.    Scott and Plaintiff had the same or similar roles in the organization, making them directly comparable for determining bonus eligibility. Both held the position of Head of Capabilities Acceleration at the same time and under the same leadership. Scott became bonus-eligible in February 2022, although Plaintiff did not become aware of this fact until Spring of 2024.

32.    In the Spring of 2024, when bonuses were being paid out for 2023, it became clear

that all other employees of legacy Flywheel in positions of Director or higher were paid bonuses, while Plaintiff was not. Flywheel thus perpetuated its practice of paying its white employees on a preferential basis, and of discriminating against Plaintiff, who is neither white nor male. To Plaintiff's knowledge, those employees receiving bonuses included, among others: Ben Jessup (Director, white male), Morgan Scott (Director, white female), Stephen McBride (Senior Director, white male), Kate Greubel (Senior Director, white female), and Rob Kearns (Senior Director, white male).

### G. Flywheel's Pattern of Discrimination Rooted in CEO's Cronyism

33.     Flywheel's pattern of discriminatory actions can be traced to Alex McCord's rise in rank within Flywheel's executive team. McCord fostered a culture where hiring and promotions were not based on merit and equal opportunity, but on cronyism within McCord's inner circle. After Flywheel was purchased by Ascential, and the co-founders started to back away from executive functions, including hiring and promotions, this left those decisions in the hands of McCord and Abi Harmon.

34.     When McCord was promoted to an executive leadership position, his best friends within the company got promotions to Director seats and their careers stayed on a fast-track compared to other tenured colleagues. These individuals included: Mike O'Donnell and Justin Lui, Alex's best friends. Additionally, the hiring of Rob Kearns with an unjustifiably high starting salary was also evidence of Alex's biased or preferential hiring and advancement practices.

35.     Promotions were also handled similarly, in a biased and inequitable fashion. While there was a process for promotions, ultimately the decision of who received the promotion was made by McCord and Harmon. This often veered in the favor of the retail team originally led by McCord and Harmon, but also toward McCord's inner circle. Examples of this include the Supply Chain and Creative Studio teams provided to Mike O'Donnell and the New Hire Program provided

12

to Justin Lui.

36.     McCord's cronyism fostered other examples of bias. McCord started a "run club" for midday runs with colleagues, which was viewed as a haven for employees who were favored and fast-tracked because they had become part of McCord's inner circle. When the entire Quality Engineer team was laid off, one person was spared, Sean Connors, a white male in McCord's run club.

**H.  Lack of Objective Measures Perpetuated Discrimination.**

37.     Flywheel lacked objective job performance measures and arbitrarily ignored published guidelines in a manner that fostered subjective judgments, adding to the discriminatory and retaliatory actions complained of here. Flywheel did not implement or maintain job descriptions for Senior Directors during Plaintiff's employment at Flywheel. Neither did Flywheel have skills matrices, or career pathways to suggest what was expected of each level.

38.     Plaintiff asked for the role description of a Senior Director along with one for vice president so she knew what to work toward, and learned that they did not exist. In this vacuum, Plaintiff proposed one to her manager Hannah Donoghue, and put together a Professional Development Plan (PDP) in 2024 for leadership to implement across the organization, since this was lacking. The PDP was approved by Human Resources, according to the feedback Plaintiff received from Donoghue, but it was not implemented, to Plaintiff's knowledge. Flywheel's organizational disregard of the PDP violated procedural justice, enabled inequitable practices, and further enabled CEO McCord's leveraging to promote the interests of his favored employees, primarily white males.

**I.  Flywheel's Acts of Retaliation**

39.     In March 2024, Plaintiff raised her concerns about discriminatory treatment to her manager and to Human Resources. It was her expressed desire to continue to work at Flywheel, as

shown by her continued contribution to the organization and her application for the position of Vice President, Commerce Operations. The offenses that came to light after Plaintiff started asking questions and digging for more information pointed to inequitable pay on the basis of race, sex, and national origin.

40.     Based on the discovery of her claims and her desire to show background evidence that the discriminatory actions of Flywheel's leadership were intentional and recurring, Plaintiff included a longer history of events leading up to her involuntary separation on August 26, 2024. Flywheel had an employee handbook with an EEO policy encouraging employees to bring to supervisors' attention violations of policies. Plaintiff made management aware of the following:

a.  In 2021, Plaintiff reported to Stephen McBride and raised that she was passed up for promotion to Associate Director since she was going on maternity leave. Instead, the job went to a less experienced white male, Ben Jessup. McBride told Plaintiff that both she and Jessup were put up for promotion, but that McCord selected Jessup over her.

b.  Several times in the period 2020-2022, Plaintiff reported to Craig Granger directly and expressed to him her belief that she was being passed up for promotional opportunities.

c.  In 2023, supervisor Megan Lippert observed to Plaintiff that there was an inequitable bonus structure at Flywheel. She noticed that Plaintiff was not bonus eligible, while others in her role were. She confirmed that she would escalate this to be corrected, but it was not. In in subsequent conversations. Lippert told Plaintiff that they were still waiting on paperwork from Human Resources—paperwork that never arrived.

d.  As noted, Plaintiff was not aware of the full extent of the discriminatory pay issues until 2024, when she found out that she was not being paid a 2023 bonus. She raised the matter with her manager, Hannah Donoghue. At first Donoghue related that she had

spoken with Alex McCord and was told the books were closed for 2023 so Plaintiff would not be paid a bonus, but would be bonus-eligible in the future. She then had Plaintiff discuss it with Human Resources by telephone, followed up by emails in March and April 2024, all without positive results.

41.     Despite these communications to Plaintiff's managers over a period of years, when Plaintiff took the matter to Human Resources, she was not provided the opportunity to fill out a complaint form. This is further evidence that Flywheel did not follow its own policies or take seriously the EEO concerns. The policies were not implemented or enforced, nor were they embedded in Flywheel's Standard Operating Procedures (SOPs). Similarly, people managers were not trained in the policies, and leadership including Alex McCord and Human Resources willfully did not follow them.

## J.  Additional Evidence of Pretext

42.     Throughout the course of Plaintiff's complaints in 2024, Flywheel changed its rhetoric to protect its discriminatory actions against Plaintiff and other protected employees. Flywheel claims that bonus eligibility was paused or suspended. However, employees received their 2023 bonuses in 2024, which triggered Plaintiff's complaints. Plaintiff had requested back payment of her earned bonus, not just bonus eligibility in the future. She was not told initially that she was not receiving her bonus because of a pause. The contrived excuses shifted from the assertion that the books had closed, to a question about whether she had a commitment about future bonuses in writing, to the excuse that there was a pause due to an exercise in "leveling" compensation begun in 2021 after Flywheel's parent company acquired two companies (even though the later compensation issues concerned acquired employees, not legacy Flywheel employees like Plaintiff). The shifting explanations, none of them true, are pretexts for the discrimination and retaliation against Plaintiff.

43.    Flywheel's claim that it did not replace Plaintiff or redistribute her duties to any remaining employees is also false and pretextual. As Senior Director of Client Operations, Plaintiff was charged with improving Consulting Operations and leading the Client Education team, which was responsible for creating self-service learning modules for users of the new platform Flywheel was building. The role of overseeing the Client Education team did not disappear as is claimed by Flywheel, but was reassigned to Senior Director Lauren Martin and then to Tim Jefferson who was promoted to Senior Director. Flywheel thus retained Plaintiff's significant role, and its assertion to the contrary is a pretext for discrimination.

### K.  Plaintiff's Injuries

44.    Flywheel's actions and failures to act alleged here have caused Plaintiff to suffer harm, including, without limitation, lost earnings, lost benefits, and other financial losses.

45.    Flywheel's actions and failures to act alleged here have caused Plaintiff to suffer non-economic damages due to pain and suffering, humiliation, embarrassment, indignity, emotional distress, and mental anguish.

46.    Flywheel's actions and failures to act alleged here have been intentional, deliberate, willful, malicious, reckless, and in callous disregard for Plaintiff's rights, entitling her to compensatory and punitive damages.

**COUNT I**
**VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.***
**DISCRIMINATION BASED ON RACE, SEX, AND NATIONAL ORIGIN**

47.    Plaintiff repeats and realleges the allegations of the preceding paragraphs, as if fully set forth herein.

48.    Plaintiff filed a timely charge with the Equal Employment Opportunity Commission (EEOC) with regard to the matters alleged here. More than 180 days have elapsed since the filing of

the charge.

49.     Under Title VII of the Civil Rights Act of 1964, 42 U.S. Code § 2000e-2(a), it is an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

50.     Title VII discrimination claims do not require any heightened requirement of a "material" or "tangible" impact. Title VII's ban forbidding employers to "discriminate against" an employee in the "terms" or "conditions" of employment requires an employee to prove only that a challenged action caused the employee "some harm respecting an identifiable term or condition of employment," even if it does not cause a "significant" injury to the employee. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024). All that is needed is a "'disadvantageous' change in an employment term or condition." *Id.* at 354, 359 (citation omitted). The alleged violations in this case meet or exceed these standards in every respect.

51.     As more particularly alleged here, Flywheel discriminated against Plaintiff on the basis of her race, sex, and national origin in comparison with and in favor of white, male, and non-Asian employees when it: 1) paid Rob Kearns and other employees substantially higher salaries for comparable or equal work requiring equal skill, effort, and responsibility as Plaintiff's work, and which was performed under similar working conditions; 2) made other comparable employees such as Kearns and Morgan Scott bonus-eligible and paid them bonuses while depriving Plaintiff of the bonus-eligible status and payment of bonuses; 3) denied Plaintiff a significant pay increase in line with her work experience, job responsibilities, and accomplishments, while granting a

17

significant pay increase to a less-qualified white male, Austin Seibert; 4) continually deprived Plaintiff of improved employment opportunities, and failed to promote Plaintiff to the position of Vice President of Commerce Operations, a position for which Plaintiff was especially well-suited based on her experience and expertise, and instead selected a less-qualified white male, Meir Areman; and 5) terminated Plaintiff's employment, on a pretextual basis, without any legitimate reason, and in retaliation for Plaintiff's having engaged in protected activity under federal and Maryland law.

52. As alleged more particularly here, Flywheel's actions and inactions have caused injury to Plaintiff, resulting in economic and non-economic harm, and entitling Plaintiff to monetary and compensatory damages, along with an award of attorney's fees, costs, and expenses.

53. As a result of the disparate treatment discrimination, Flywheel has treated Plaintiff in a disadvantageous manner in comparison with white, male, and non-Asian employees with respect to the terms and conditions of her employment.

54. Flywheel has discriminated against Plaintiff with malice or with reckless indifference to Plaintiff's federally protected right to be free from discrimination. Flywheel terminated Plaintiff's employment on the basis of her race, gender, and national origin, despite knowing that such discrimination was illegal. Plaintiff is therefore entitled to punitive damages under Title VII pursuant to 42 U.S.C. § 1981a(b)(1).

55. Plaintiff is therefore entitled to all legal and equitable remedies available for violation of Title VII.

<u>**COUNT II**</u>
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000e-3(a).**
**RETALIATION**

56. Plaintiff re-alleges and incorporates allegations in the preceding paragraphs as if

fully stated herein.

57.     Plaintiff filed a timely charge with the Equal Employment Opportunity Commission (EEOC) with regard to the matters alleged here. More than 180 days have elapsed since the filing of the charge.

58.     Title VII protects against retaliation or reprisal toward an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). For retaliatory conduct to be actionable under Title VII, it must be "materially adverse" to the plaintiff, "which in [the retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 68 (2006) (citations omitted). The alleged violations in this case meet standard.

59.     When Plaintiff complained about the actions against her and the loss of employment opportunities due to unlawful discrimination, Flywheel retaliated by continuing to take adverse actions against her, ultimately resulting in the termination of her employment.

60.     Based on the totality of circumstances—including documented patterns of bias, clear disparities in compensation and bonus structures, abrupt shifts in internal policy and rhetoric following Plaintiff's protected activity, and demonstrable misrepresentations of facts in response to her claims—the adverse actions taken against Plaintiff would not have occurred absent her decision to raise concerns about equitable compensation, advancement in employment opportunities, and bonus eligibility. The sequence and timing of events, inconsistency in treatment compared to other legacy Flywheel colleagues who were white or male, and the reactive nature of leadership's conduct all support that Flywheel acted due to unlawful retaliation against Plaintiff. Collectively, Flywheel's retaliatory actions show that Plaintiff's protected activity triggered a

deliberate effort to discredit, marginalize, and ultimately terminate her employment from her position of Senior Director at Flywheel.

61.     Under the facts alleged here, a reasonable person would find Flywheel's retaliatory acts materially adverse and that such acts would dissuade a reasonable person from complaining about or opposing discrimination.

62.     As alleged more particularly here, Flywheel's actions and inactions have caused injury to Plaintiff, resulting in economic and non-economic harm.

63.     As a result of the retaliation against Plaintiff, Flywheel has treated Plaintiff in a materially adverse manner in comparison with white, male, and non-Asian employees with respect to the terms and conditions of her employment.

64.     Flywheel retaliated against Plaintiff with malice or with reckless indifference to Plaintiff's federally protected right to be free from discrimination and retaliation, and terminated Plaintiff's employment on the basis of her race, gender, and national origin, despite knowing that such discrimination and retaliation was illegal. Plaintiff is therefore entitled to punitive damages under Title VII pursuant to 42 U.S.C. § 1981a(b)(1).

65.     Plaintiff is entitled to all legal and equitable remedies available for violation of Title VII.

### COUNT III
### VIOLATION OF
### MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA")
### MD. STATE GOV'T CODE §§ 20-601 *et seq.*
### DISCRIMINATION BASED ON RACE, SEX, AND NATIONAL ORIGIN

66.     Plaintiff repeats and realleges the allegations of the preceding paragraphs, as if fully set forth herein.

67.     Plaintiff filed a timely charge with the Equal Employment Opportunity Commission (EEOC) with regard to the matters alleged here. The charge was cross-filed with the Maryland

20

Commission on Civil Rights.

68.    Under Maryland State Gov't Code § 20-606(a), an employer may not:

(1) fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of:

(i)    the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, military status, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; or…

(2) limit, segregate, or classify its employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee because of:

(ii)   the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, military status, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment. . . .

69.    As more particularly alleged here, Flywheel discriminated against Plaintiff on the basis of her race, sex, and national origin in comparison with and in favor of white, male, and non-Asian employees when it: 1) paid Rob Kearns and other employees substantially higher salaries for comparable or equal work requiring equal skill, effort, and responsibility as Plaintiff's work, and which was performed under similar working conditions; 2) made other comparable employees such as Kearns and Morgan Scott bonus-eligible and paid them bonuses while depriving Plaintiff of the bonus-eligible status and payment of bonuses; 3) denied Plaintiff a significant pay increase in line with her work experience, job responsibilities, and accomplishments, while granting a significant pay increase to a less-qualified white male, Austin Seibert; 4) continually deprived Plaintiff of improved employment opportunities, and failed to promote Plaintiff to the position of Vice President of Commerce Operations, a position for which Plaintiff was especially well-suited based on her experience and expertise, and instead selected a less-qualified white male, Meir Areman; and 5) terminated Plaintiff's employment on a pretextual basis, without any legitimate

21

reason, and in retaliation for Plaintiff's having engaged in protected activity under federal and Maryland law.

70.     As a result of the disparate treatment discrimination, Flywheel has treated Plaintiff in a materially adverse manner in comparison with white, male, and non-Asian employees with respect to the terms and conditions of her employment.

71.     As alleged more particularly here, Flywheel's actions and inactions have caused injury to Plaintiff, resulting in economic and non-economic harm, entitling her to monetary and compensatory damages, Maryland State Gov't Code § 20-1013, incorporating § 20-1009(b), along with an award of attorney's fees, costs, and expenses, Maryland State Gov't Code § 20-1015.

72.     As alleged more particularly here, Flywheel has acted with actual malice toward Plaintiff, entitling her to punitive damages in the fullest measure allowable under Maryland law, Maryland State Gov't Code § 20-1013(e).

**<u>COUNT IV</u>**
**VIOLATION OF**
**MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA")**
**MD. STATE GOV'T CODE §§ 20-601 *et seq*.**
**RETALIATION**

73.     Plaintiff re-alleges and incorporates allegations in the preceding paragraphs as if fully stated herein.

74.     Plaintiff filed a timely charge with the Equal Employment Opportunity Commission (EEOC) with regard to the matters alleged here. The charge was cross-filed with the Maryland Commission on Civil Rights.

75.     Under Maryland State Gov't Code § 20-606(f):

> An employer may not discriminate or retaliate against any of its employees or applicants for employment, an employment agency may not discriminate against any individual, and a labor organization may not discriminate or retaliate against any member or applicant for membership because the individual has:

(1) opposed any practice prohibited by this subtitle; or

(2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subtitle.

76.     When Plaintiff complained about the actions against her and the loss of employment opportunities due to unlawful discrimination, Flywheel retaliated by continuing to take adverse actions against her, ultimately resulting in the termination of her employment.

77.     Based on the totality of circumstances—including documented patterns of bias, clear disparities in compensation and bonus structures, abrupt shifts in internal policy and rhetoric following Plaintiff's protected activity, and demonstrable misrepresentations of facts in response to her claims—the adverse actions taken against Plaintiff would not have occurred absent her decision to raise concerns about equitable compensation, advancement in employment opportunities, and bonus eligibility. The sequence and timing of events, inconsistency in treatment compared to other legacy Flywheel colleagues who were white or male, and the reactive nature of leadership's conduct all support that Flywheel acted due to unlawful retaliation against Plaintiff. Collectively, Flywheel's retaliatory actions show that Plaintiff's protected activity triggered a deliberate effort to discredit, marginalize, and ultimately terminate her employment from her position of Senior Director at Flywheel.

78.     Under the facts alleged here, a reasonable person would find Flywheel's retaliatory acts materially adverse and that such acts would dissuade a reasonable person from complaining about or opposing discrimination.

79.     As a result of the retaliation against Plaintiff, Flywheel has treated Plaintiff in a materially adverse manner in comparison with white, male, and non-Asian employees with respect to the terms and conditions of her employment.

80.     As alleged more particularly here, Flywheel's actions and inactions have caused injury to Plaintiff, resulting in economic and non-economic harm, entitling her to monetary and

compensatory damages, Maryland State Gov't Code § 20-1013(b), incorporating § 20-1009(b), along with an award of attorney's fees, costs, and expenses, Maryland State Gov't Code § 20-1015.

81.    As alleged more particularly here, Flywheel has acted with actual malice toward Plaintiff, entitling her to punitive damages in the fullest measure allowable under Maryland law, Maryland State Gov't Code § 20-1013(e).

**COUNT V**
**VIOLATION OF**
**EQUAL PAY ACT OF 1963 ("EPA"), 29 U.S.C. § 206(d); 29 U.S.C. § 215(a)(3)**

82.    Plaintiff re-alleges and incorporates allegations in the preceding paragraphs as if fully stated herein.

83.    The EPA prohibits sex-based wage discrimination between men and women in the same establishment who perform equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

84.    The EPA provides, 29 U.S.C. § 206(d)(1):

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

85.    Flywheel has discriminated against the Plaintiff on the basis of her gender in violation of the EPA, 29 U.S.C. § 206(d)(1), by paying her significantly less as a Senior Director, than her similarly situated male comparator, Senior Director Rob Kearns. Kearns earned over $60,000 more than Plaintiff did in annual salary, even though Plaintiff performed the same work

24

as Kearns in the same establishment and under similar working conditions requiring the same skill, effort, and responsibility.

86.    Flywheel has further discriminated against Plaintiff on the basis of her gender in violation of the EPA by making Kearns bonus-eligible, and by paying him a substantial bonus or bonuses, while Plaintiff was denied bonus-eligible status and was not paid a bonus.

87.    29 U.S.C. § 215(a)(3) makes it unlawful for any person:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;

88.    When Plaintiff complained about unequal pay on the basis of gender due to unlawful discrimination, Flywheel retaliated by continuing to take adverse actions against her, and by terminating her employment.

89.    As shown under the facts alleged here, the adverse actions taken against Plaintiff would not have occurred absent her complaints about unequal pay in violation of the EPA, including the failure to pay her a bonus. Flywheel's retaliatory actions show that Plaintiff's protected activity triggered a deliberate effort to discredit, marginalize, and ultimately terminate her employment from her position of Senior Director at Flywheel.

90.    As alleged more particularly here, Flywheel's actions and inactions have caused injury to Plaintiff, entitling her to damages and other relief for violation of the EPA pursuant to 29 U.S.C. § 216(b), including "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) or 218d of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages," and "a reasonable attorney's fee to be paid by the defendant, and costs of the action."

**COUNT VI**
**VIOLATION OF**
**MARYLAND EQUAL PAY FOR EQUAL WORK ACT ("MEPEWA"),**
**MD. LAB & EMPL CODE §§ 3-301 *et seq.***

91.    Plaintiff re-alleges and incorporates allegations in the preceding paragraphs as if fully stated herein.

92.    The MEPEWA prohibits racial or sex-based wage discrimination between workers who perform "work of comparable character or work on the same operation, in the same business, or of the same type." The MEPEWA is thus broader than the federal EPA, which applies to "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."

93.    The MEPEWA provides, Md. Lab & Empl Code § 3-304(b):

(1)    An employer may not discriminate between employees in any occupation by:

(i)    paying a wage to employees at a rate less than the rate paid to other employees if the employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type and the pay difference is based on the race, religious beliefs, sex, gender identity, or sexual orientation of the employees; or

(ii)    providing less favorable employment opportunities based on sex, race, religious beliefs, sexual orientation, disability, or gender identity.

(2)    For purposes of paragraph (1)(i) of this subsection, an employee shall be deemed to work at the same establishment as another employee if the employees work for the same employer at workplaces located in the same county of the State.

94.    Flywheel has discriminated against the Plaintiff on the basis of her race and gender in violation of the MEPEWA by paying her significantly less as a Senior Director than her white male comparator, Senior Director Rob Kearns. Kearns earned over $60,000 more than Plaintiff did in annual salary, even though Plaintiff performed comparable work on the same operation, in the same business, or of the same type as Kearns.

26

95.    Flywheel has further discriminated against Plaintiff on the basis of her race and gender in violation of the MEPEWA by making Kearns and Morgan Scott, a white female, bonus-eligible, and by paying them a substantial bonus or bonuses, while Plaintiff was denied bonus-eligible status and was not paid a bonus.

96.    As alleged more particularly here, Flywheel's actions and inactions have caused injury to Plaintiff, entitling her to actual damages and an additional equal amount as liquidated damages, along with an award of attorney's fees, costs, expenses, and prejudgment interest, all for violation of MEPEWA. Md. Lab & Empl Code § 3-307.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests that the Court:

(a) Convene a trial by jury;

(b) Find Defendant's conduct to be discriminatory in violation of Title VII, the FEPA, the EPA, and the MEPEWA;

(c) Find Defendant's conduct to be retaliatory in violation of Title VII, the FEPA, and the EPA;

(d) Enjoin Defendant from further violations of Title VII, the FEPA, the EPA, and the MEPEWA, including, as necessary, reinstatement of Plaintiff to her previous employment with the full position, pay and benefits as if she had not been discharged; or, in the alternative if reinstatement is not feasible, an award of front pay;

(e) Award Plaintiff all damages to which she is entitled for Defendant's violation of Title VII, the FEPA, the EPA, and the MEPEWA, including, but not limited to, lost wages, salary, employee benefits, and any other compensation denied or lost as a result of the violations, prejudgment interest, liquidated damages, compensatory damages, and punitive damages, along with an award of attorney's fees, expenses, and costs, all as provided for in the applicable

27

statutes; and

(f) Grant such other and further relief as the Court may deem just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

May 22, 2026                                          ANDREA DALAKER

By:

/s/Raymond C. Fay
Raymond C. Fay
D. Md. Bar No. 08213
Fay Law Group PLLC

1250 Connecticut Ave NW Ste 700
Washington, DC 20036
(202) 263-4604 (tel)
(202) 261-3508 (fax)
rfay@faylawdc.com

/s/ Robert Baldwin III
Robert Baldwin III, Esq.
Md. Bar No. 20793
Virtue Law
1250 Connecticut Ave., NW Suite 700
Washington, DC 20036
(301)821-6407
Robert@virtuelawgroup.com

*Counsel for Plaintiff*